UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
CHARLENE JONES o/b/o T.J.,

                Plaintiff,

    — against —

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                Defendant.
------------------------------------------------------------------X

**MEMORANDUM AND ORDER**

07-CV-4886 (SLT)

**TOWNES, United States District Judge:**

Charlene Jones ("Plaintiff") brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), on behalf of her son, T.J., to seek reversal of a final decision of the Commissioner of Social Security ("Commissioner") that T.J. was not eligible for supplemental security income ("SSI") under the Social Security Act ("the Act"). Plaintiff maintains that T.J. is entitled to SSI based on his attention deficit hyperactivity disorder. The Commissioner has filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, seeking dismissal of Plaintiff's complaint. Based upon the written submissions of the parties, a thorough review of the record, and the reasons that follow, the Commissioner's motion is granted.

## BACKGROUND

### I. Procedural History

On April 25, 2006, Plaintiff filed an application for SSI on behalf of T.J. based on his attention deficit hyperactivity disorder ("ADHD"). Admin. R. ("A.R.") 13, 21. The application was administratively denied on June 28, 2006, *id.* at 35-37. Proceeding *pro se, id.* at 150, Plaintiff requested a hearing by an administrative law judge ("ALJ"), *id.* at 28-31. ALJ Miriam Shire held a hearing on Plaintiff's claim on April 13, 2007 and denied the claim on May 21,

1

2007. *Id.* at 13-20, 22-25. The ALJ's finding that Plaintiff was not disabled became the final decision of the Commissioner on September 26, 2007, when the Appeals Council denied her request for review. *Id.* at 4-7. Plaintiff commenced this action *pro se* on November 21, 2007, and the Commissioner sought judgment on the pleadings on August 6, 2008.

## II. Factual Background

T.J. was born on June 17, 1996 and was 11 years of age at the time his mother submitted his application for SSI. *Id.* at 63. T.J. visited the Woodhull Medical and Mental Health Center ("Woodhull") on June 15, 2005, September 30, 2005, November 29, 2005, and April 26, 2006. A.R. 73-79. Records from Woodhull reveal normal physical and mental evaluations for the 2005 visits, except for allergic conjunctivitis in September 2005. *Id.* Nevertheless, during the April 26, 2006 visit, Dr. Samia Makaryus diagnosed T.J. with expressive language disorder, attention deficit disorder ("ADD") with hyperactivity. *Id.* at 79.

T.J. was evaluated at the Interfaith Medical Center Behavioral Health Child and Adolescent Clinic ("Interfaith Clinic") on January 20, 2006. *Id.* at 85. According to Interfaith Clinic's records, T.J. was brought in by his father for hyperactivity, a bad temper, and behavioral problems at school. *Id.* T.J.'s father reported that T.J. does academically well at school and recently experienced the death of a cousin and an uncle. *Id.* The record indicates that T.J. had no past psychiatric history or drug or alcohol abuse. *Id.* T.J. was diagnosed with adjustment disorder with "mild disturbance of emotional condition," rule out attention deficit hyperactivity disorder, and rule out anxiety disorder. *Id.* at 86. Meryam Sheriaty, M.D., prescribed T.J. with strattern and increased his prescription from 25 milligrams a day to 35 milligrams a day between January 25, 2006 and April 24, 2006. *Id.* at 88. T.J. also received weekly group therapy. *Id.* On February 6, 2007, Dr. Sheriaty concluded that T.J. can dress, wash, bathe, feed himself, but his

2

attention deficit hyperactivity disorder ("ADHD") required him to be watched after school. *Id.* at 118. On June 25, 2007, Dr. Sheriaty and David Leng, LMSW, of the Interfaith Clinic wrote a letter advocating that T.J. would benefit from smaller classroom size. *Id.* at 124. They stated that T.J.'s "academic behavioral history shows that his impulsiveness, hyperactivity, and distractibility are aggravated in regular education settings. With closer supervision, smaller class size and more individual educational planning, we believe that [T.J.'s] educational needs will be met and subsequently thrive in school." *Id.*

Jessica Page, Psy.D., evaluated T.J. on June 2, 2006, as a consultative examiner. *Id.* at 90-97. According to Dr. Page, T.J. had no history of psychiatric hospitalization. *Id.* at 91. T.J.'s mother reported to Dr. Page general behavioral symptoms such as losing his temper easily, becoming easily annoyed, arguing with adults, actively defying or refusing to comply with requests and aggressiveness, fighting at school and at home with his sisters. *Id.* Although T.J.'s mother stated that T.J. had attention and concentration problems, Dr. Page indicated that there does not "seem to be any distractibility or hyperactivity." *Id.*

Dr. Page found that T.J.'s demeanor and responsiveness to questions were cooperative and his manner of relating and social skills were adequate. *Id.* at 92. She described his general appearance and dress as appropriate and his personal hygiene and grooming as good. *Id.* His eye contact and expressive and receptive language were appropriate and his speech and language skills were fluent. *Id.* He was coherent and goal directed with no evidence of hallucinations, delusions, or paranoia. *Id.* He had a full range affect and was appropriate in speech and thought content. *Id.* His mood was neutral, his sensorium clear, and his orientation normal as to time, place, and person. *Id.*

Dr. Page indicated that his attention and concentration were intact and he could do counting, simple calculations and serial 3s. *Id.* at 93. She also found his memory skills intact and age appropriate and his intellectual functioning to be in the average range. *Id.* His insight and judgment were also rated as age appropriate. *Id.* According to Dr. Page's report, T.J. can dress, bathe, and groom himself. *Id.* He assists with household chores and gets along well with family and friends. *Id.*

During testing, he was cooperative, friendly, relaxed and comfortable. *Id.* at 95. Dr. Page found no evidence of a reading disability or signs of significant emotional distress during the evaluation. *Id.* His full scale IQ was 90. *Id.* at 96. Dr. Page reported that he functions in the average range of general intelligence and performed with consistent strength in verbal comprehension, perceptual reasoning, working memory and processing speed. *Id.* 93, 96. According to Dr. Page,

> [T.J.] can attend to, follow, and understand age-appropriate directions. He can complete age-appropriate tasks. He can adequately maintain social behavior. He can respond appropriately to changes in the environment. He can learn in accordance with cognitive function. He can ask questions and request assistance in an age-appropriate manner. He is aware of danger and takes needed precautions. He can interact adequately with peers and interact adequately with adults. The results of the evaluation are consistent with psychiatric problems, but in itself, do not appear significant enough to interfere with [T.J.'s] ability to function on a daily basis.

*Id.* at 93. Dr. Page also concluded that "the "results of the evaluation are not consistent with cognitive problems that would significantly interfere with [T.J.'s] ability to function on a daily basis." *Id.* at 96. Dr. Page diagnosed T.J. with disruptive behavior disorder, NOS. *Id.*

J. Minola, M.D., a state agency physician, assessed T.J. on June 10, 2006. *Id.* at 99. Dr. Minola reported that T.J. had a diagnosis of disruptive behavior disorder and that his school report indicated that he has difficulties with his classmates and needed more support than is

provided in a regular class. *Id.* at 104. Dr. Minola stated that T.J. has trouble focusing on school subjects, he likes to play with other students, and he can interact adequately with peers and adults. *Id.* at 100. He found that T.J. had "less than marked" limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and no limitations in moving about and manipulating objects, and caring for himself. *Id.* at 100-01. Dr. Minola found that T.J.'s impairment of disruptive behavior is severe, but does not meet, medically equal or functionally equal a disability listing. *Id.* at 98.

The record also includes some of T.J.'s school records, including teacher questionnaires, *id.* at 58-65, 116-17, an individualized education program ("IEP") assessment, *id.* at 126-134, and an IEP report, *id.* at 139-46. On May 16, 2006, C. Lally, who was T.J's teacher for only four months at the time, stated that T.J. had problems functioning in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself. *Id.* at 58-65. "Conners' Teacher Rating Scale" questionnaires filled out by Lally on January 20, 2006 and January 23, 2007, note the same types of behavioral problems for T.J. with the latter questionnaire showing some increase in problematic behavior. *Id.* at 116-17. Based on a June 22, 2007 evaluation, the IEP assessment draws the following conclusion,

> [T.J.] has been diagnosed with ADHA and is currently receiving medication and behavioral therapy to address behavioral symptoms. . . . Based upon WISC IV [T.J.'s] Cognitive functioning falls within the Average Range. The WIAT-II assesses his Reading and Written Language abilities to be within the Low Average Range, while his Mathematics capacities to be within the Average Range. Projective data further suggests that [T.J.] is an assertive, ambitious child who is usually unsure of his behaviors and tends to react impulsively to things as a means of compensating for lack of confidence in his abilities. In sum, based upon [T.J.'s] diagnosis of ADHA he would benefit from a classification of Other Health Impairment. His academic setting should be as requested by his parents and therapist a Small Class in a Community School (12:1) to address academic and impulsive needs. He would also benefit from continuing counseling in the

provided in a regular class. *Id.* at 104. Dr. Minola stated that T.J. has trouble focusing on school subjects, he likes to play with other students, and he can interact adequately with peers and adults. *Id.* at 100. He found that T.J. had "less than marked" limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and no limitations in moving about and manipulating objects, and caring for himself. *Id.* at 100-01. Dr. Minola found that T.J.'s impairment of disruptive behavior is severe, but does not meet, medically equal or functionally equal a disability listing. *Id.* at 98.

The record also includes some of T.J.'s school records, including teacher questionnaires, *id.* at 58-65, 116-17, an individualized education program ("IEP") assessment, *id.* at 126-134, and an IEP report, *id.* at 139-46. On May 16, 2006, C. Lally, who was T.J's teacher for only four months at the time, stated that T.J. had problems functioning in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself. *Id.* at 58-65. "Conners' Teacher Rating Scale" questionnaires filled out by Lally on January 20, 2006 and January 23, 2007, note the same types of behavioral problems for T.J. with the latter questionnaire showing some increase in problematic behavior. *Id.* at 116-17. Based on a June 22, 2007 evaluation, the IEP assessment draws the following conclusion,

> [T.J.] has been diagnosed with ADHA and is currently receiving medication and behavioral therapy to address behavioral symptoms. . . . Based upon WISC IV [T.J.'s] Cognitive functioning falls within the Average Range. The WIAT-II assesses his Reading and Written Language abilities to be within the Low Average Range, while his Mathematics capacities to be within the Average Range. Projective data further suggests that [T.J.] is an assertive, ambitious child who is usually unsure of his behaviors and tends to react impulsively to things as a means of compensating for lack of confidence in his abilities. In sum, based upon [T.J.'s] diagnosis of ADHA he would benefit from a classification of Other Health Impairment. His academic setting should be as requested by his parents and therapist a Small Class in a Community School (12:1) to address academic and impulsive needs. He would also benefit from continuing counseling in the

community to facilitate social emotional growth and awareness of appropriate social responses.

*Id.* at 133-34. In relevant part, the IEP report, dated June 26, 2007, indicated that T.J. is a "charming hyperactive boy" with "impulsive tendencies." *Id.* at 141. It stated that he is easily distracted by environmental stimulus and takes a long time to refocus. *Id.* The IEP found he would benefit from an environment that contains limited distractions and provided immediate feedback. *Id.* It concluded that T.J.'s behavior does not seriously interfere with instruction and can be addressed with special education classes. *Id.*

At a hearing before the ALJ on April 13, 2007, Plaintiff testified that she started noticing a change in T.J.'s behavior in the previous two to three years, coinciding with the death of two family members. *Id.* at 158-59. Plaintiff testified that T.J. did not have problems with his teacher in 2006, but that she started receiving calls from the teacher in 2007. *Id.* at 164. She noted that T.J. began to get in arguments with other children and that his teacher would often complain about him. *Id.* at 159. Plaintiff stated that the teacher complained that T.J. cannot keep still and that the teacher could not understand what was going on with T.J. *Id.* at 159-60. Plaintiff explained that in 2007, T.J. was steadily getting into fights with other children and was running out of the class, and not listening to the teacher. *Id.* at 164. Plaintiff noted that T.J.'s behavior was different at home, mainly because of the attention she gives him. *Id.* at 166-67. T.J. would get into fights with his little sister, but Plaintiff did not think it was out of the ordinary. *Id.* at 167. She testified that she had to sit with him to make sure he finished his homework and that he would take awhile to complete his homework because he would stop in between and would need to be redirected to finish it. *Id.* at 168. Plaintiff testified that T.J. does not have many friends and often plays video games by himself. *Id.* at 167, 169.

On May 21, 2007, the ALJ issued a written decision denying the Plaintiff's application for benefits on behalf of T.J. finding that T.J. he was not disabled for purposes of eligibility for SSI benefits. *Id.* at 19A-20. The ALJ determined that, while his ADHD was severe, T.J. had no limitation in acquiring and using information, moving about and manipulating objects, caring for himself, his health and physical well-being and has a "marked limitation" in attending and completing tasks and a "less than marked limitation" in interacting and relating with others. *Id.* at 18-19. The ALJ concluded that T.J.'s impairment does not meet, medically equal, or functionally equal a presumptively-disabled impairment. *Id.* at 19.

## DISCUSSION

### I. Standard of Review

This Court may set aside an ALJ's decision only where it is based upon legal error or where its factual findings are not supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999) (internal quotation marks omitted). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

This Court also reviews the ALJ's decision to determine whether the ALJ applied the correct legal standard. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). "'Where an error of law has been made that might have affected the disposition of the case, this Court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply

deferring to the factual findings of the ALJ.'" *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (quoting *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 n.3 (11th Cir. 1982)). This Court reviews questions of law *de novo*. *Id*.

## II. Legal Standard for Disability in Children

An individual under the age of eighteen is disabled, and thus eligible for SSI benefits, if he has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i). Nevertheless, this definition excludes from coverage any "individual under the age of [eighteen] who engages in substantial gainful activity...." 42 U.S.C. § 1382c(a)(3)(C)(ii).

By regulation, the Commissioner has prescribed a three-step evaluative process to be employed in determining whether a child can meet the statutory definition of disability. 20 C.F.R. § 416.924; *Kittles v. Barnhart*, 245 F. Supp. 2d 479, 487-88 (E.D.N.Y. 2003); *Ramos v. Barnhart*, No. 02 Civ.3127, 2003 WL 21032012, at *7 (S.D.N.Y. May 6, 2003). The first step of the test requires a determination of whether the child has engaged in substantial gainful activity. 20 C.F.R. § 416.924(b); *Kittles*, 245 F. Supp. 2d at 488. If so, then both statutorily and by regulation the child is ineligible for SSI benefits. 42 U.S.C. § 1382c(a)(3)(C)(ii); 20 C.F.R. § 416.924(b). If the claimant has not engaged in substantial gainful activity, the second step of the test requires examination of whether the child suffers from one or more medically determinable impairments that, either singly or in combination, are properly regarded as severe, in that they cause more than a minimal functional limitation. 20 C.F.R. § 416.924(c); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. At step three, if the existence of a severe

8

impairment is discerned, the Commissioner must then determine whether it meets or equals a presumptively disabling condition identified in the listing of impairments set forth under 20 C.F.R. Pt. 404, Subpt. P., App. 1 (a "Listed impairment"). 20 C.F.R. § 416.924(d). Equivalence to a Listed impairment can be either medical or functional. 20 C.F.R. § 416.924(d); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If an impairment is found to meet, or qualify as medically or functionally equivalent to, a listed disability and the twelve-month durational requirement is satisfied, the claimant will be deemed disabled. 20 C.F.R. § 416.924(d)(1); *Ramos*, 2003 WL 21032012, at *8.

Analysis of functional equivalence is informed by consideration of how a claimant functions in six main areas referred to as "domains." 20 C.F.R. § 416.926a(b)(1); *Ramos*, 2003 WL 21032012, at *8. The domains are described as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). Those domains include: "(i) [a]cquiring and using information; (ii)[a]ttending and completing tasks; (iii) [i]nteracting and relating with others; (iv)[m]oving about and manipulating objects; (v)[c]aring for [oneself]; and (vi)[h]ealth and physical well-being." 20 C.F.R. § 416.926a(b)(1). Functional equivalence is established in the event of a finding of an "extreme" limitation, meaning "more than marked," in a single domain. 20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8. An "extreme limitation" is an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(I). Alternatively, a finding of disability is warranted if a "marked" limitation is found in any two of the listed domains. 20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8. A "marked limitation" exists when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "A marked

limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C).

## III. T.J.'s Claim for Disability

The ALJ evaluated T.J.'s claim under the three-step process set forth in 20 C.F.R. § 416.924. At step one, the ALJ found that T.J. had never engaged in substantial gainful activity. A.R. at 14, 19A. At step two, the ALJ concluded that T.J.'s ADHD was a severe impairment within the meaning of the regulations. *Id.* The Court turns to step three – whether T.J.'s impairment meets or equals any Listed impairment.

### A. T.J.'s Impairment Does Not Meet a Listed Impairment

Under step three of the disability framework, if the ALJ finds that the child suffers from a Listed impairment and the twelve-month durational requirement is satisfied, the claimant is presumptively disabled and benefits should be granted. *See* 20 C.F.R. § 416.924(d). In this case, the ALJ found that T.J.'s impairment did not meet any Listed impairment. A.R. at 15, 19A. Substantial evidence supports this conclusion.

ADHD is a Listed impairment for children, described as "developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11. In order to meet the Listed definition of ADHD, the level of severity of the disorder must include the following conditions from both paragraphs A and B:

    A. Medically documented findings of all three of the following:
    1. Marked inattention; and
    2. Marked impulsiveness; and
    3. Marked hyperactivity;
    And

B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

*Id.* In turn, Section 112.02(B)(2) sets forth the following qualifying conditions:

a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.102(B)(2). Thus, to meet the Listed impairment of ADHD, the child must have marked inattention, impulsiveness, and hyperactivity in addition to at least two of the following characteristics: marked impairment in cognitive/communication function, social functioning, or personal functioning, or marked difficulties in maintaining concentration, persistence, or pace.

In this case, the ALJ failed to refer specifically to the ADHD Listing criteria in her decision. Although the ALJ thoroughly reviewed all the evidence in the record elsewhere in her written opinion, with respect to whether the evidence established that T.J.'s condition meets the criteria for a Listed impairment, the ALJ's decision is barebones and conclusory. The ALJ only

states, "[c]laimant's impairments, while severe, do not, either singly or in combination, meet any impairment in the Listing." A.R. at 15. Courts have required an ALJ to provide an explanation as to why the claimant failed to meet or equal the Listings, "[w]here the claimant's symptoms as described by the medical evidence appear to match those described in the Listings." *Kuleszo v. Barnhart*, 232 F. Supp. 2d 44, 52 (W.D.N.Y. Sept. 30, 2002). Nevertheless, if an ALJ's decision lacks an express rationale for finding that a claimant does not meet a Listing, a court may still uphold the ALJ's determination where portions of the ALJ's decision and the evidence before her indicate that the conclusion was supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982); *see also Mushtare v. Astrue*, No. 7:06-CV-1055, 2009 WL 2496453, at *12 (N.D.N.Y. Aug. 12, 2009).

Here, the record as cited by the ALJ supports a finding that T.J. could not satisfy at least two conditions from Section 112.02(B)(2) and, thus, his condition would not meet a Listed impairment. First, the record does not reveal an impairment of his cognitive or communication function. As the ALJ noted, T.J. scored an IQ of 90, which is considered to be in the average range of intellectual functioning. A.R. at 16. He performed with consistent strength in verbal comprehension, perceptual reasoning, working memory and processing speed in tests administered by Dr. Page. Furthermore, Dr. Page found T.J.'s manner of relating and social skills adequate, his expressive and receptive language appropriate, and his speech and language skills fluent.

Second, T.J.'s medical records do not indicate an impairment of social functioning. As the ALJ credited, although his family raised issues with T.J.'s behavior problems and bad temper, Dr. Page found that T.J. gets along well with family and friends and that, during testing, he was cooperative, friendly, relaxed and comfortable. A.R. at 17. She also concluded that he

could adequately maintain social behavior. Furthermore, Dr. Minola agreed that T.J. likes to play with other students, and he can interact adequately with peers and adults.

Finally, there is no evidence that T.J. maintains a limitation in his personal functioning. Dr. Page determined that T.J. can dress, bathe, and groom himself. She described his general appearance and dress as appropriate and his personal hygiene and grooming as good. He even assists with household chores. Thus, upon this record, T.J.'s condition does not encompass a marked impairment in either cognitive/communication function, social functioning, or personal functioning. Accordingly, although the ALJ could have done a better job in specifying her findings in this regard, the ALJ's ultimate conclusion that T.J. does not meet a Listed impairment is supported by substantial evidence.

### B. T.J.'s Impairment Does Not Functionally Equal a Listed Impairment

The ALJ also found that T.J.'s impairment did not functionally equal any Listed impairment. A.R. at 19, 19A. In making this determination, the ALJ applied the six-domain functionality analysis set forth in 20 C.F.R. § 416.926a. In the following four domains, the ALJ concluded that T.J. had no limitations: acquiring and using information, moving about and manipulating objects, caring for oneself, health and physical well-being. The ALJ determined that T.J. had a marked limitation in the domain of attending and completing tasks and a less than marked limitation in interacting and relating with others. *Id.* at 18.

The same evidence supporting the conclusion that T.J. does not have a marked impairment in either cognitive/communication function, social functioning, or personal functioning, also establishes the lack of limitations in the first four domains. As Dr. Page concluded and the ALJ credited,

> [T.J.] can attend to, follow, and understand age-appropriate directions. He can complete age-appropriate tasks. He can adequately maintain social behavior. He

> can respond appropriately to changes in the environment. He can learn in accordance with cognitive function. He can ask questions and request assistance in an age-appropriate manner. He is aware of danger and takes needed precautions. He can interact adequately with peers and interact adequately with adults. The results of the evaluation are consistent with psychiatric problems, but in itself, do not appear significant enough to interfere with [T.J.'s] ability to function on a daily basis.

*Id.* at 17, 93.

Plaintiff complains about T.J.'s behavior at school and the teacher's questionnaires in the record also show that T.J. has some behaviorial problems in the classroom. Nonetheless, T.J.'s father indicates he does academically well at school and school records indicate T.J.'s behavior does not seriously interfere with his instruction and can be addressed with special education classes.

Furthermore, the ALJ's finding that T.J.'s limitation in the domain of attending and completing tasks is "marked" is also supported by the record. This domain measures how well the child is able to focus and maintain attention, and how well he begins, carries through and finishes activities, including the pace at which he performs activities and the ease with which he changes them. 20 C.F.R. § 416.926a(h). Evidence from T.J.'s parents, teachers, and consultative examiners all show that he has problems completing tasks as a result of his ADHD. Nevertheless, T.J.'s limitations in this domain are appropriately considered "marked" rather than "extreme" as T.J.'s parents and teachers indicate that he can successfully complete tasks if refocused and given individualized attention. Indeed, Dr. Page reported no distractibility and found T.J.'s attention and concentration intact.

Finally, the ALJ's determination that T.J. has less than marked limitations in interacting and relating with others is warranted by the record. This domain measures how well the child initiates and sustains emotional connections with others, develops and uses the language of his

community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i). The record indicates that, while he gets into fights with others in school and his little sister, he can interact adequately with peers and adults and enjoys playing with other students in school. The school records describe him as "charming" even if "hyperactive" and "impulsive." *Id.* at 141.

Accordingly, because T.J. does not have an "extreme limitation" in any domain and only has a "marked limitation" in one domain, his impairment does not functionally equal a Listed impairment and the ALJ's conclusion that he is not disabled is supported by substantial evidence. *See* 20 C.F.R. § 416.926a(e)(3)(I). *See also Brown ex rel. JK v. Astrue*, No. 07-4201-cv, 2009 WL 59167, at *1 (2d Cir. Jan. 12, 2009) ("In order for an impairment or combination of impairments to be the functional equivalent of a listed impairment, the child must show a 'marked' impairment in two functional areas or an 'extreme' limitation in one area.")

C.  **New Evidence**

In response to the Commissioner's motion for judgment on the pleadings, Plaintiff submitted the following additional evidence: (1) a September 5, 2007 New York City Department of Education letter classifying T.J. with "Other Health Impairment" and placing him in a special class with support services (12:1); (2) a January 4, 2008 letter from Dr. Sheriaty indicating that T.J.'s medication dosage has been increased; (3) a March 27, 2008 letter from Dr. Sheriaty stating that T.J. can be started on a new prescription to help him with his impulsive, hyperactive behavior; (4) a May 23, 2008 teacher questionnaire; and (5) a July 23, 2008 letter from Dr. Samia Makaryus diagnosing T.J. with anemia.

The Court did not consider this new evidence in reviewing the Commissioner's final decision as it is not properly part of the administrative record. *See Grubb v. Chater*, 992 F.Supp.

634, 637 n.3 (S.D.N.Y. 1998) (new evidence not considered because "[a] court's review of the Commissioner's decision is to be based upon the administrative record"); *Madrigal v. Callahan*, No. 96 Civ. 7558, 1997 WL 441903, at *7 (S.D.N.Y. Aug. 6, 1997) ("in reviewing decisions of the Commissioner, this Court cannot consider new evidence not made part of the administrative record").

Nevertheless, in certain circumstances, this Court may order a remand to the Commissioner to consider new evidence. To obtain a remand based on evidence presented for the first time in the district court, the plaintiff must establish (1) the evidence is "new" and not merely cumulative of evidence in the administrative record, (2) the new evidence is "material," *i.e.*, "it must be relevant to the claimant's condition during the time period for which benefits were denied and probative," and (3) good cause for failing to present the evidence earlier. *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988); *see also Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991); 42 U.S.C. § 405(g) (sentence six) ("The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.").

In this case, most of the new evidence is not material to T.J.'s claim for disability because they evaluate T.J. for the period well after September 26, 2007, when the Commissioner rendered his final decision, and therefore are not relevant to T.J.'s condition during the time period for which benefits were denied. *See Casiano v. Apfel*, 39 F. Supp. 2d 326, 332 (S.D.N.Y. 1999) (denying remand where new evidence describe claimant's condition after the Commissioner's final decision and thus do not relate to the time period for which benefits were denied) (collecting cases). The only evidence that pre-dates the Commissioner's final decision is

16

the September 5, 2007 letter from the N.Y.C. Department of Education. Yet, this evidence is merely cumulative of evidence already in the record as it largely reiterates the findings of the IEP assessment and report. *See* A.R. at 126-34, 139-46

Furthermore, even if the evidence reflected the time period for which T.J.'s claim was denied, there is no reasonable probability that the evidence would change the outcome of the Commissioner's decision. First, the May 23, 2008 teacher questionnaire is similar to and cumulative of the January 20, 2006, May 16, 2005, and January 24, 2007 questionnaires. *See id.* at 58-65, 116-17. Second, the letters indicating a change in T.J.'s medication regimen do not describe a change in his ADHD impairment or his functionality. Third, the letter describing T.J.'s treatment for anemia does not materially impact the Commissioner's consideration of his ADHD impairment or show a diminution of his functionality. Thus, the Court finds the new evidence would not materially affect the Commissioner's assessment of T.J.'s impairment. Accordingly, a remand is unnecessary based on this new evidence.

## CONCLUSION

For the foregoing reasons, the Court grants the Commissioner's motion for judgment on the pleadings is granted. This case is dismissed and the Clerk of the Court is directed to close this case.

**SO ORDERED.**

/S/
_____
SANDRA L. TOWNES
United States District Judge

Dated: March 17, 2010
       Brooklyn, New York